IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ALLISSA N. SAXTON, | CASE NO. 1:24-cv-1571 |
| Plaintiff, | DISTRICT JUDGE CHARLES ESQUE FLEMING |
| vs. | |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Allissa Saxton filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Disability Insurance Benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In April 2022, Saxton filed an application for Disability Insurance Benefits alleging a disability onset date of January 9, 2020,[1] and claiming she

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

was disabled due to bipolar disorder, general panic disorder, depression, and post-traumatic stress disorder (PTSD). Tr. 155, 181. The Social Security Administration denied Saxton's application and her motion for reconsideration. Tr. 56, 65. Saxton then requested a hearing before an Administrative Law Judge (ALJ). Tr. 89.

In July 2023, an ALJ held a hearing. Saxton and a vocational expert testified. Tr. 31–59. The next month, the ALJ issued a written decision finding that, from the alleged onset date through September 30, 2021, the date last insured, Saxton was not disabled. Tr. 18–26.[2] Tr. 18–26. The ALJ's decision became final on July 22, 2024, when the Social Security Appeals Council declined further review. Tr. 1–4; *see* 20 C.F.R. § 404.981.

Saxton filed this action on September 13, 2024. Doc. 1. She asserts the following assignments of error:

1. Whether the [ALJ] erred when failing to identify substantial evidence supporting the residual functional capacity finding.

2. Whether the ALJ erred when failing to comply with SSR 16-3p regarding Plaintiff's subjective allegations.

Doc. 10, at 1.

---

[2]    Saxton filed an application under Title II of the Social Security Act for disability insurance benefits. Tr. 155. Under Title II, an eligible claimant must establish disability on or before the date last insured. *See* 20 C.F.R. §§ 404.101, 404.130–31.

**Evidence**

*Personal and vocational evidence*

Saxton was born in 1981 and was 38 years old on her alleged disability onset date. Tr. 155. She attended college for two years. Tr. 182. She used to work as a bartender, waitress, and part-time office manager and last worked in 2020. Tr. 37–39, 51.

*Relevant medical evidence*[3]

In September 2018, almost 16 months before her alleged disability onset date, Saxton saw Michael D. Stormont, M.D., for anxiety. Tr. 257. Saxton said that she had obsessive thoughts, a "scattered brain," and difficulty focusing. Tr. 257. Dr. Stormont's assessment was anxiety disorder and mixed obsessional thoughts and acts. Tr. 257. In October, Saxton followed up with Dr. Stormont for a medication refill. Tr. 259. Saxton had been taking Zoloft for a month, but she did not feel that it was working well and she continued to struggle. Tr. 259. She reported feeling depressed, nervous, and anxious. Tr. 259. Dr. Stormont's exam findings showed that Saxton had a normal mood and affect. Tr. 259. Dr. Stormont assessed Saxton with anxiety disorder, "mixed obsessive thoughts and acts," and binge eating disorder. Tr. 259. He suggested that Saxton follow up with one of her other doctors. Tr. 259.

---

[3]  Saxton's brief includes passages in which she string-cites up to 31 pages of the transcript covering almost three years. Doc. 10, at 4–5. This is not an appropriate way to present evidence and I do not reproduce it here.

In August 2020, Saxton followed up with Dr. Stormont for back pain. Tr. 267. On exam, Saxton had a normal mood, affect, and behavior. Tr. 267.

In early November 2020, Saxton saw Dr. Stormont for medication management. Tr. 270. Saxton reported that she was waking up during the night and had increased panic attacks. Tr. 270. She said that she saw other providers for her anxiety but they "[we]ren't willing to [prescribe] anything more than what they are already giving." Tr. 270. Dr. Stormont prescribed Belsomra for Saxton's insomnia. Tr. 276.

In late November 2020, Saxton saw Physician Assistant Nicole Wurstle for medication management and a follow-up for depression and anxiety. Tr. 387. Saxton said that she was sleeping better since her Gabapentin dosage was increased. Tr. 387. She reported feeling somewhat irritable. Tr. 388. About ten days later, Saxton saw her counselor for a therapy session. Tr. 385. At this visit, the counselor assessed Saxton as "mildly depressed" and grieving the deterioration of her mother's health. Tr. 385–86.

In late December Saxton saw Wurstle for a follow-up. Tr. 381. Saxton reported feeling overwhelmed the day before the appointment. Tr. 381. She did not feel rested despite getting enough sleep and her energy was low. Tr. 381–82. Saxton rated her anxiety as high and said that she felt "like she could completely breakdown." Tr. 382. She reported "some panic attacks but she [wa]s managing." Tr. 382. Wurstle's exam findings showed that Saxton had fair grooming and eye contact; cooperative behavior and demeanor; calm motor

4

activity; a good mood; and a full, reactive affect. Tr. 383. She had no suicidal ideation and passive homicidal ideation without plan or intent. Tr. 383. Saxton's thought process was linear, logical, and goal directed, and she had no abnormal thought content or associations. Tr. 383. Saxton had clear speech; intact language; grossly intact attention and concentration; and fair insight and judgment. Tr. 383.

In mid-January 2021, Saxton saw Wurstle and discussed recent life stressors regarding the health of close family members. Tr. 377. Saxton said that she and her friends planned to do something fun over the upcoming weekend and were trying to plan a trip to Florida. Tr. 377. Saxton reported having "a big panic attack" and hyperventilating "when her mother had gotten very sick" before Christmas. Tr. 378. Saxton described her mood as "tired" and said she did not have the drive to do things. Tr. 377. Saxton's exam findings were the same as her prior visit. Tr. 379. Wurstle prescribed an additional dose of Gabapentin to help with anxiety. Tr. 379.

About a month later, Saxton told Wurstle that her focus was poor. Tr. 370. Saxton reported that in the weeks before the appointment, she had two panic attacks. Tr. 370. She said that she curled up in a ball and cried for a while, and then she "cleaned her house and went to grocery stores." Tr. 370. Saxton's exam findings were the same as her prior visit. Tr. 371. Wurstle increased Saxton's Vyvanse dosage to help with depression. Tr. 371.

In mid-March 2021, Saxton's mood was flat and she felt exhausted. Tr. 361. Saxton reported feeling more irritable and having increased anger and poor energy. Tr. 361–62. Her focus was "not the best." Tr. 361. Saxton "hate[d] going out in public" but "ma[de] herself do it because she knows she needs to." Tr. 362. She reported being on the verge of panic attacks. Tr. 362. Her exam findings at this visit were the same as her prior visit. Tr. 363.

In late March 2021, Saxton saw her therapist. Tr. 359. She was grieving her mother's death, and while she had returned to her regular work and home schedule, she felt like she was in a fog. Tr. 359. In April, Saxton followed up with Wurstle and described her mood as "okay" and "not as melancholy." Tr. 355. She reported "a little" anger a week before the appointment "after being exhausted … do[ing] a lot of errands and running around." Tr. 356. Saxton notic[ed] social anxiety" when she was around large groups of people. Tr. 356. She felt anxious when she tried to go to sleep and reported "her 'standard anxiety,'" which was manageable, and no "major panic attacks." Tr. 356.

In early May 2021, Saxton told her therapist that overall she was doing well. Tr. 353. She had travelled to Florida and met with friends and family, which helped her mourn her mother's death. Tr. 353.

About a week later, Saxton followed up with Wurstle. Tr. 349. Saxton reported that her trip to Florida had gone well, but she had struggled the week before the appointment. Tr. 349. She "went into 'hermit' mode during Mothers' Day." Tr. 349. Everything was irritating her and she was avoiding things—for

instance, she would not answer a ringing phone. Tr. 349. Saxton said that she took her dogs for walks. Tr. 349. On exam, Saxton had an irritable mood and a distressed affect. Tr. 351. Her other exam findings were the same as her prior visit: fair grooming and eye contact; cooperative behavior and demeanor; calm motor activity; passive homicidal ideation without plan or intent; normal thought process and thought content; clear speech; intact language; grossly intact attention and concentration; and fair insight and judgment. Tr. 351. Wurstle started Saxton on Abilify to help with major depressive disorder. Tr. 351.

On June 8, Saxton told Wurstle that she had one panic attack but "was able to talk herself 'out of it.'" Tr. 346. She felt calm and described her anxiety as "hit or miss"—some days were "okay" and her anxiety was manageable. Tr. 346. On exam, Saxton's mood was good, her affect was full and reactive, and her other findings were the same as her prior visit. Tr. 347. A week later, Saxton saw her therapist. Tr. 343. She reported that her body-image self-despair had reemerged, despite having lost 50 pounds after weight-loss surgery. Tr. 343.

In July 2021, Saxton followed up with Wurstle. Tr. 339. Saxton said that she gained ten pounds while taking Abilify. Tr. 339. Her body-image feelings were improving and overall she felt "fine." Tr. 339. Saxton said that she tired easily and lost energy quickly, although she reported having "a busy week." Tr.

340. Saxton's exam findings were the same as her prior visit. Tr. 341. Wurstle discontinued Abilify. Tr. 341.

In December 2021, Saxton told her therapist that she had struggled the past month with increased depression and anxiety. Tr. 329. She experienced a panic attack and anger, pain, and frustration after a disappointing experience with a friend. Tr. 329. This experience left her feeling abandoned "which seemed to trigger similar feelings surrounding the death of her mother." Tr. 329. The next day, Saxton followed up with Wurstle for depression and anxiety. Tr. 325. She reiterated that she "ha[d] been struggling lately" said "ha[d] a bad panic attack recently." Tr. 325. Saxton reported she had been Christmas shopping and was caring for her friend, who was recovering from plastic surgery. Tr. 325. Saxton described her mood as "either tightly wound or do not want to talk to anyone." Tr. 325. She rated her mood as "4.5" out of ten. Tr. 326. Her energy was "hit or miss"—some days she felt "great" in the mornings but "crashe[d]" later in the day. Tr. 326. Saxton said that she wasn't sleeping well, her focus was "okay" with medication, and her anxiety was high and she didn't want to leave her house. Tr. 326. She reported having "a few" panic attacks. Tr. 326. On exam, Saxton had fair grooming and eye contact; cooperative behavior and demeanor; calm motor activity; an irritable mood; a full reactive affect; and no signs of mania. Tr. 327. She had no suicidal or homicidal ideation. Tr. 327. Her thought process was linear, logical, and goal directed, and she had no abnormal thought content or associations. Tr. 327.

Saxton had pressured speech; intact language; grossly intact attention and concentration; and fair insight and judgment. Tr. 327. Wurstle stopped Saxton's Trazodone and prescribed Seroquel. Tr. 328.

Eleven days later, Saxton told Wurstle that she preferred Trazodone to Seroquel. Tr. 322. Saxton reported sleeping five hours at night and being unable to nap during the day. Tr. 321. She described her mood as "pretty good/not bad." Tr. 321. Saxton rated her anxiety as "high" and said that it was "hard to get out of the house." Tr. 321. Being around people was hard and she had a panic attack after a family gathering. Tr. 321. On exam, Saxton had fair grooming and eye contact; cooperative behavior and demeanor; calm motor activity; a good mood; and a full, reactive affect. Tr. 322–23. She had no suicidal or homicidal ideation. Tr. 323. Her thought process was linear, logical, and goal directed, and she had no abnormal thought content or associations. Tr. 323. Saxton had clear speech; intact language; grossly intact attention and concentration; and fair insight and judgment. Tr. 323. Wurstle started Saxton on Latuda and discontinued Seroquel. Tr. 323.

In January 2022, Saxton saw Wurstle and said that her mood was "pretty good." Tr. 318.  She "has been able to get out of the house and go run errands." Tr. 318. Saxton was sleeping better and hadn't noticed any medication side effects, although she reported daily headaches. Tr. 317. Wurstle adjusted Saxton's medications. Tr. 319. In February, Saxton denied medication side effects, told Wurstle that her medication helped with mood

stability and anxiety, and asked to reduce the Vyvanse dosage because it was "a little too much." Tr. 313, 315. Wurstle adjusted Saxton's medications. Tr. 315. Saxton's exam findings at these visits remained the same as her prior visit. Tr. 314–15, 319.

In early March 2022, Saxton reported experiencing a hypomanic episode, which she described as feeling anxious and irritable, talking fast, having racing thoughts, and getting mad and emotional. Tr. 309. On exam, Saxton had a "good" mood, a full and reactive affect, and normal thought process and content. Tr. 311. She had no suicidal or homicidal ideation, clear speech, a grossly intact attention span, and fair insight and judgment. Tr. 311. Wurstle increased Saxton's Latuda dosage. Tr. 311. About ten days later, Saxton told Wurstle that the Latuda made her feel antsy and "awful" and she didn't want to take it anymore. Tr. 304. She lacked energy and was frustrated about not sleeping well. Tr. 304. On exam, Saxton had a tired mood and a dull, semi-reactive affect. Tr. 306. Her remaining exam findings were the same as her prior visit. Tr. 206. Wurslte stopped Latuda and prescribed Lamictal. Tr. 307.

In April 2022, Saxton followed up with Wurstle and said that her sleep was improving. Tr. 300. Vyvanse helped with her focus, anxiety, and motivation. Tr. 300. Saxton reported feeling highly irritable and anxious. Tr. 300. She "ha[d] gotten close to panic attacks" and had to remove herself from the situation. Tr. 300–01. Saxton's subjective screening indicated moderate

10

depressive symptoms, severe anxiety, and no insomnia. Tr. 303. On exam, Saxton had a good mood, a full and reactive affect, no suicidal or homicidal ideation, and normal thought process and content. Tr. 302. She had clear speech, a grossly intact attention span, and fair insight and judgment. Tr. 302. Wursle adjusted Saxton's medications. Tr. 302.

The next month, Saxton told Wurstle that her medications were helping and that she slept better, enjoyed things again, was not as irritable, and was able to work through things. Tr. 296. She said that she had driven to a convention in Cleveland for a social event. Tr. 296. Saxton's mood, energy, focus, anger, and anxiety were better and she denied any recent panic attacks. Tr. 296. Saxton's subjective screening showed mild depression, moderate anxiety, and no insomnia. Tr. 298. Exam findings were the same as Saxton's prior visit. Tr. 297–98.

In June 2022, Saxton followed up with Wurstle. Tr. 400. Saxton had experienced "a lot" of stressors (including a tree falling on her house) which she tolerated "really well." Tr. 400. Despite these stressors, she was still able to accomplish things. Tr. 400. She still had some trouble falling asleep but she slept seven hours a night. Tr. 400. Her exam findings were as before, Tr. 401–02, and her subjective screening showed moderate depression and anxiety. Tr. 402.

In August 2022, Saxton told Wurstle that she was having trouble sleeping and that she had "high anxiety." Tr. 465. She had been working "doing

more photography," had gone shopping, and "ma[de] herself spend time with friends." Tr. 465. Saxton described her mood as "quiet [and] withdrawn" and reported psychomotor agitation. Tr. 465. Her exam findings were the same as her prior visit. Tr. 466–67. Wurstle increased the Lamictal dosage. Tr. 467. In September, Saxton said that the increased dose of Lamictal was helping her symptoms, but it caused "more brain fog." Tr. 459. Her subjective screening showed moderate depression and severe anxiety. Tr. 461. Saxton's exam findings were the same as her prior visit, Tr. 460–61, and Wurstle continued Saxton's medications, Tr. 461.

In October 2022, Saxton told Wursle that she had low energy and motivation, a depressed mood, irritability, and panic attacks. Tr. 455. Her subjective screening showed severe depression and anxiety. Tr. 457. Her exam findings remained the same as her previous visits: a good mood, a full and reactive affect, no suicidal or homicidal ideation, normal thought process and content, clear speech, a grossly intact attention span, and fair insight and judgment. Tr. 456–57. In December, Saxton reported sleeping about three hours a night and waking up every hour, which caused her to feel miserable. Tr. 445. Her anxiety was high and she reported seeing things out of the corner of her eye. Tr. 445–46. Saxton said that she had intrusive thoughts while driving and impulsive spending. Tr. 445. Saxton's subjecting scoring indicated moderate depressive and anxiety symptoms. Tr. 447. Her exam findings were

the same as her prior visit. Tr. 447. Wurstle adjusted Saxton's medications. Tr. 447.

In January 2023, Saxton followed up with Wurstle after having switched to the medication Ambien for sleep issues. Tr. 440. Saxton reported feeling depressed and not wanting to leave the house. Tr. 440. When she left the house, her anxiety spiked. Tr. 440. The "weather [w]as not helping," making going out less appealing. Tr. 440. Saxton "tr[ied] to take Vyvanse but it [w]as not working." Tr. 440. She said that she had a depressed mood, poor energy and focus, and she was irritable. Tr. 440–41. Saxton's subjective screening showed severe depression and anxiety. Tr. 442. Saxton's exam findings were the same as her prior visit. Tr. 442. Wurstle adjusted Saxton's medications and suggested a "light box" for seasonal depressive symptoms. Tr. 442–43.

In February 2023, Saxton told Wurstle that she had stressors at home and felt on edge as a result. Tr. 436. She was not sleeping well, so her energy was poor and she experienced headaches. Tr. 436. Saxton said that her anxiety was "not good." Tr. 436. Her exam findings were the same as her prior visit. Tr. 438. Wurstle adjusted Saxton's medications and ordered a sleep study. Tr. 438.

In March 2023, Saxton described her mood as "very blah." Tr. 432. Vyvanse helped her energy and focus—she did more things and got things done. Tr. 432. Saxton described her anger as "hit or miss" and she felt stressed due to her husband's friend living in her house. Tr. 432. Saxton's exam findings

13

were the same as her prior visit. Tr. 434. Saxton said that things were going well on her current medication regime and Wurstle made no medication changes. Tr. 434.

In April 2023, Saxton said that her mood was improving and that the nicer weather helped. Tr. 428. She had visited a Japanese market and mowed the grass. Tr. 428. Her energy level and anger were better and her anxiety was "a little higher." Tr. 428. Saxton's subjective screening indicated mild depression and severe anxiety. Tr. 430. Saxton's exam findings were the same as her previous visit. Tr. 430. Saxton stated that things were "gong well" with her medication regime and Wurstle continued her medications. Tr. 430.

In May 2023, Saxton told Wurstle that her anxiety had been low, but "peaked" when she had to leave her home. Tr. 424. Saxton planned to get a new tattoo. Tr. 424. She reported that she had not been manic in three months. Tr. 424. Saxton's exam findings were the same as her prior visit and she reported doing well on her medication regime. Tr. 425–26. In June, Saxton reported feeling "meh" and "dull" and not having the energy to do things. Tr. 420. She reported having gone on a day trip with friends and having fun. Tr. 420. Saxton's subjective screening showed moderately severe depression and moderate anxiety. Tr. 422. Saxton's exam findings were the same as her prior visit: fair grooming and eye contact; cooperative behavior and demeanor; calm motor activity; a good mood; and a full, reactive affect. Tr. 422. Saxton's thought process was linear, logical, and goal directed, and she had no abnormal

14

thought content or associations and no suicidal or homicidal ideations. Tr. 422. Saxton had clear speech; intact language; grossly intact attention and concentration; and fair insight and judgment. Tr. 422. Wurstle lowered Saxton's Vraylar dosage to "help with blunting effect" and increased Saxton's Vyvanse dosage "to help with Binge Eating Disorder." Tr. 422.

*Function Report*

In May 2022, Saxton completed a function report. Tr. 196–203. She reported that being around people was hard and caused her to feel anxious. Tr. 196. She described her daily activities as caring for her husband, daughter, and pets. Tr. 197. She denied any problems with personal care. Tr. 197. Saxton prepared her own meals. Tr. 198. She was physically able to perform household chores but not always mentally able to do so. Tr. 198. She avoided the public when possible. Tr. 199. Saxton could go out alone "when absolutely necessary" but it caused her to experience anxiety, so she preferred to go out with others. Tr. 199. Saxton went to the store to grocery shop and could manage her finances. Tr. 199. Her main hobbies were watching movies and television. Tr. 200. She spent time with others but did not do so often. Tr. 200. Saxton said that she got along "very well" with authority figures. Tr. 201. When asked about following written instructions, she wrote that she could follow a recipe. Tr. 201. Saxton indicated that she did not handle stress or changes in routine well. Tr. 201–02.

*State agency opinions*[4]

In June 2022, psychologist Karla Delcour, Ph.D., reviewed Saxton's record. Tr. 57–60. Dr. Delcour opined that Saxton had no limitations in understanding, remembering, or applying information; a mild limitation in concentrating, persisting, or maintaining pace; and moderate limitations in interacting with others and adapting or managing oneself. Tr. 59. Regarding Saxton's residual functional capacity (RFC),[5] Dr. Delcour opined that Saxton "can interact occasionally in situations that do not require persuasion or frequent contact with the general public" and work "in an environment with infrequent changes." Tr. 62.

In September 2022, psychologist David Dietz, Ph.D., reviewed Saxton's record and agreed with Dr. Delcour's findings, Tr. 67–71, except that Dr. Dietz added that Saxton could work in an environment with infrequent changes "in day to day duties." Tr. 70.

---

[4]     When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[5]     An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

*Hearing testimony*

Saxton, who was represented by counsel, testified at the telephonic administrative hearing held in July 2023. Saxton testified that she had a driver's license and could drive. Tr. 40. She lived in a home with her husband and adult daughter. Tr. 44–45. When asked why she was unable to work, Saxton explained that she has always suffered from an anxiety disorder. Tr. 40. When her mother was diagnosed with a terminal illness in 2020, Saxton was her mother's main caretaker and this caused Saxton's anxiety and depression to spiral out of control. Tr. 40. During this time, Satxon had "a massive panic attack" and couldn't leave her house or be around people. Tr. 40. She said that she has bouts of depression and doesn't leave her room for days. Tr. 41. Saxton doesn't go to stores by herself—she has to go with her husband. Tr. 41.

For treatment, Saxton takes medication and sees a psychiatrist. Tr. 42. In some ways, treatment has helped, "but in most aspects" it has not. Tr. 42. Medication side effects have been short-lived because she stopped taking those medications. Tr. 42. Saxton denied any significant difficulties with her memory. Tr. 43. She had issues maintaining attention and concentration. Tr. 43. She could read books and watch movies, but she often multitasked because it was hard to focus on one thing. Tr. 43. Saxton was "pretty good" at following

instructions. Tr. 44. She "get[s] along well with people," but "do[es]n't do well with having to interact with them." Tr. 44.

When asked to compare her symptoms at the time of the hearing with her symptoms in September 2021, Saxton said that her depressive symptoms at the time of the hearing were worse. Tr. 49.

The ALJ discussed with the vocational expert Saxton's past relevant work as a bartender and waitress. Tr. 51. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Saxton could perform Saxton's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 51–52. The vocational expert answered that such an individual could not perform Saxton's past work but could perform the following jobs in the national economy: industrial cleaner, hand packager, and store laborer. Tr. 52. The ALJ asked how much off-task time an employer would tolerate, and the vocational expert replied that more than ten percent, or six minutes per hour, of off-task time would be work preclusive. Tr. 52–53. When asked about absences or tardiness, the vocational expert said that an employee could be absent or tardy no more than one day a month, for no more than eight times total per year. Tr. 53. As for additional breaks during the workday, the vocational expert stated that her answer would be the same as her answer regarding off-task time. Tr. 53.

## The ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant last met the insured status requirements of the Social Security Act on September 30, 2021.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of January 9, 2020, through her date last insured of September 30, 2021 (20 CFR 404.1571 *et seq*.).

3. Through the date last insured, the claimant had the following severe impairments: depression, anxiety, binge eating disorder, post-traumatic stress disorder (PTSD); and attention deficit hyperactivity disorder (ADHD) (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: the claimant can carry out simple instructions. She cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas. Additionally, the claimant can have occasional interaction with the public, co-workers, and supervisors. Moreover, the claimant can deal with occasional changes in a routine work setting.

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born [i]n … 1981 and was 40 years old, which is defined as a younger individual age 18–49, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from January 9, 2020, the alleged onset date, through September 30, 2021, the date last insured (20 CFR 404.1520(g)).

Tr. 20–26.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

20

period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

> 1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.
>
> 2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.
>
> 3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.
>
> 4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.
>
> 5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id*. "The

claimant, however, retains the burden of proving her lack of residual functional capacity." *Id*. If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id*. at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

1. *Substantial evidence supports the ALJ's RFC finding*

Saxton argues that the ALJ failed to identify substantial evidence to support her RFC finding. Doc. 10, at 10. She highlights this portion of the ALJ's decision:

> As for the claimant's statements about the intensity, persistence, and limiting effects of her symptoms, they are inconsistent because her overall treatment was conservative, showing medication management with no indication of hospitalizations. Notes after the date last insured showed improvement in 2022 as well; and therefore, there is no worsening condition that relates back. The State agency (DDS) findings discussed in the opinion section below are supported but the undersigned also added additional limitations in consideration of reports of focus and issues in the record. For instance, her ongoing reports of panic attacks, depression, and anxiety would limit her to carrying out simple instructions, and no product rate work or work with hourly quotas, with only occasional changes in the work setting. Her social anxiety and tendency to isolate, per her testimony, would result in occasional interactions with the public, coworkers, and supervisors. Her binge eating disorder seems to be intertwined with her anxiety. Her PTSD and ADHD would also result in the limitations in the residual

23

functional capacity, including the social limitations discussed above. Regardless, her allegations and testimony are inconsistent with the medical evidence of record, including evidence after the date last insured showing linear and logical thought content, no delusions, clear speech, grossly intact attention span and concentration, and fair insight and judgment. (Ex. 5F-9, Hearing testimony). As a result, the overall evidence of record does not support the claimant's allegations.

*Id.* at 12 (citing Tr. 24). The ALJ went on to explain:

The State agency (DDS) consultants found that the claimant had mild-to-moderate mental limitations, which would limit her to interacting occasionally in situations that do not require persuasion or frequent contact with the general public, and she was capable of working in an environment with infrequent changes in day-to-day duties. (Exs. 2A, 4A). Although the undersigned adopts the functional terms, these psychological findings are not persuasive, as the treatment notes dating back to 2018 and discussed above, show issues with focus, a scattered brain, and insomnia/sleep disturbance, which support greater mental limitations, which are found in the residual functional capacity in this decision. Additionally, the social limitation provided by DDS is confusing and vague. Regardless, these opinions are not persuasive, as they are not consistent with the claimant's longitudinal mental health record.

Tr. 24.

Saxton argues that the ALJ didn't "identify any evidence within the record attributing [Saxton's] panic attacks, depression, or anxiety to complex instructions" or "production rate work or changes in the work setting." Doc. 8 at 12. But the ALJ also referenced Saxton's reports of problems focusing when she limited Saxton to performing work involving simple instructions, only

occasional changes in the work setting, and no production-rate or hourly quota work.[6] Tr. 24 (ALJ stating that she assessed greater limitations than the state agency reviewers "in consideration of reports of focus and issues in the record" and referencing treatment notes showing Saxton's reports of "issues with focus, a scattered brain, and insomnia/sleep disturbance"); *see* Tr. 23 (ALJ remarking that Saxton told Dr. Stormont in 2018 that she had anxiety and difficulty focusing and citing Saxton's reports at the hearing of "ongoing problems with concentration.").

Saxton also asserts that the ALJ "did not identify any evidence within the record indicating that [Saxton] could tolerate interaction with others up to one-third of the day, which is the definition of occasional, or that [Saxton] would become more symptomatic if interacting with others more than one-third of the time." *Id*. at 12–13. But the ALJ referenced Saxton's "social anxiety and tendency to isolate, per her testimony," to support her finding that Saxton *was more limited* in social interactions than the state agency reviewers found. Tr. 24; *see* Tr. 41, 44 (hearing). The ALJ sufficiently identified relevant evidence to support her assessed limitations.

Moreover, Saxton's argument amounts to a complaint that the ALJ erred when finding Saxton to be *more limited* than the state agency reviewers

---

[6]     Saxton herself linked her difficulty focusing to her anxiety. *See* Tr. 250–51 (Saxton's pre-hearing brief to the ALJ). And in her function report Saxton indicated that she did not handle stress or changes in routine well. Tr. 201–02.

opined.[7] As the Commissioner asserts, Doc. 12, at 5–6, any error benefitted Saxton and would be harmless, at best. *See Laney v. Comm'r of Soc. Sec.*, No. 5:21-cv-1290, 2022 WL 2176539, at *7 (N.D. Ohio June 16, 2022) ("The Court will not fault the ALJ for finding more restrictions" in the RFC than were suggested in the state agency reviewers' opinions) (citations omitted); *Ferris v. Comm'r of Soc. Sec.*, No. 5:16-cv-2459, 2017 WL 5187796, at *11 n.4 (N.D. Ohio Nov. 9, 2017).

Saxton claims that the Commissioner's argument that the ALJ's RFC was more restrictive than the state agency reviewers' opinions is an unacceptable "post-hoc argument that the [state agency reviewers' opinions] are the basis of the RFC finding." Doc. 14, at 2 (citing the Commissioner's brief, Doc. 12, at 5). But it is not post-hoc rationalizing to point out that the ALJ's RFC was based on the state agency reviewers' opinions—the only opinion evidence in the record. *See* Tr. 24 (ALJ explaining that although the state agency reviewers' "psychological findings are not persuasive" because the

---

[7]     In her reply brief, Saxton states that the Commissioner's statement "that the RFC is more restrictive than the limitations contained in the [state agency reviewers' opinions] … is simply inaccurate." Doc. 14, at 1. Saxton doesn't explain how the Commissioner's statement is inaccurate, and on its face the ALJ's RFC is indeed more restrictive than the state agency reviewers' opinions. Tr. 22, 24, 70. Saxton has therefore forfeited any argument that the RFC is not more restrictive than the state agency reviewers' opinions. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

record showed that Saxton was more limited, the ALJ "adopts the functional terms" of the state agency opinions). In any event, the Sixth Circuit "ha[s] previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) (rejecting the claimant's argument that the ALJ erred by giving "no weight to nearly all the physicians' opinions regarding Mokbel-Aljahmi's ability to stand, walk, or reach"); *see Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding"). So even if one were to find that the ALJ's RFC was not "based on" the state agency reviewers' opinions, Saxton has not shown that such a situation would amount to error.

Saxton concedes that "it is ultimately the province of the ALJ to determine a Claimant's RFC" and that "an ALJ's RFC need not correspond to a particular opinion." Doc. 10, at 14. And yet, she argues that the ALJ should have obtained a medical expert, *id*. at 11–12, and asserts that the ALJ erred "by forming an RFC without obtaining any opinion evidence,"[8] *id*. at 14. She

---

[8]     Saxton writes, "[a]s argued by Plaintiff's hearing attorney, a medical expert should have been obtained prior to issuing a decision[.]" Doc. 10, at 11–12. This statement is misleading because it suggests that Saxton's attorney had argued *at the hearing* that the ALJ should obtain a medical expert. Saxton's attorney did not ask the ALJ to obtain a medical expert before, Tr. 249–51, during, Tr. 31–55, or after the hearing. It was only after the ALJ

cites *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008), in support of this argument. *Id.* at 14.

> In *Deskin*, the court held that:

> > As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

605 F. Supp. 2d at 912 (quoting *Manso-Pizarro v. Sec'y of Health & Hum. Servs.*, 76 F.3d 15, 17 (1st Cir. 1996)). But *Deskin* isn't controlling, and it has received mixed reviews. *See, e.g., Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) ("The Court finds, however, that *Deskin* … is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals."); *see also Fox v. Comm'r of Soc. Sec.*, No. 5:23-cv-580, 2023 WL 7018362, at *7–9 (N.D. Ohio Oct. 10, 2023), *report and recommendation adopted*, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023); *see Carr v. Comm'r of Soc. Sec.*, No. 5:23-cv-87, 2024

---

issued an unfavorable decision that Saxton's attorney argued to the Appeals Council that the ALJ should have obtained a medical expert. Tr. 252–53.

WL 1556398, at *11 (N.D. Ohio Jan. 8, 2024) (collecting cases), *report and recommendation adopted*, 2024 WL 1343473 (N.D. Ohio Mar. 30, 2024).

Moreover, Saxton hasn't shown that she could prevail under the rule of *Deskin* even if this Court were to follow it. She concedes that there was a medical opinion in her case, Doc. 10, at 14, and does not allege that the state agency reviewers' opinions were "outdated," *see Deskin*, 605 F. Supp. 2d at 912; *see also* Doc. 73 (Dr. Deitz's opinion on reconsideration dated September 2022, a year after Saxton's date last insured, Tr. 20). And Saxton cites no other legal authority for her claim that the ALJ should have obtained a medical expert.[9]

Saxton has not shown that the ALJ's RFC is unsupported by substantial evidence.[10]

---

[9]     Saxton cites a case that mentions "raw medical data." Doc. 10, at 15 (quoting *Anita Lynn H.-J. v. Comm'r of Soc. Sec. Admin.*, No. 3:21-cv-25, 2022 WL 10686665, *4 (S.D. Ohio June 23, 2022)). Mentioning "raw medical data" and citing a case without any explanatory information is an improper way to present an issue. *See McPherson*, 125 F.3d at 995–96. So Saxton has forfeited any potential "raw medical data" argument. *See id.*; *Lonnie F. v. Comm'r of Soc. Sec.*, No. 2:23-cv-890, 2024 WL 3506946, at *3 (S.D. Ohio July 23, 2024) (rejecting the claimant's argument when he failed to define *raw medical data* or identify such evidence in the record; "an ALJ does not improperly 'interpret raw medical data' simply by evaluating the medical evidence without the benefit of a medical opinion.") (collecting cases).

[10]     In her reply brief, Saxton states that the ALJ "mischaracterized the evidence in the record." Doc. 14, at 5. She does not identify what evidence the ALJ allegedly mischaracterized, and she did not allege this in her opening brief. So any such argument is forfeited. *See McPherson*, 125 F.3d at 995–96; *United States v. Abboud*, 438 F.3d 554, 589 (6th Cir. 2006) ("An argument first presented to the Court in a reply brief is [forfeited].").

2. *The ALJ did not err when evaluating Saxton's allegations of symptoms*

Next, Saxton challenges the ALJ's evaluation of Saxton's statements about her symptoms. Doc. 10, at 15. To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. § 404.1529. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005)).

To recap: the ALJ found that Saxton's statements "about the intensity, persistence, and limiting effects of her symptoms" were inconsistent with the entire record. Tr. 24. The ALJ explained that (1) Saxton's treatment was conservative; (2) records from 2022 (after the date last insured) showed no worsening of Saxton's condition; (3) the state agency reviewers' opinions were

supported with additional limitations; and (4) the record showed that Saxton's objective exam findings showed linear and logical thought content, no delusions, clear speech, grossly intact attention span and concentration, and fair insight and judgment. Tr. 24. The ALJ also stated that Saxton's allegations were less persuasive because they were inconsistent with her statements regarding her daily activities. Tr. 24. These are all appropriate factors for an ALJ to consider. *See* 20 C.F.R. § 404.1529(c)(1) (the ALJ considers medical opinions); (c)(2) (the ALJ considers objective exam findings); (c)(3)(iv),(v) (the ALJ considers treatment, including medication); (c)(3)(i) (the ALJ considers daily activities). Saxton's statement that the ALJ "failed to address any of the factors in relation to [Saxton's] allegations," Doc. 10, at 24, fails.

Saxton submits that she "does not require treatment in the hospital to be found disabled for a mental impairment." Doc. 10, at 23–24. But the ALJ did not state that hospitalization is a prerequisite for finding disability for a mental impairment. So this statement appears to be directed to the ALJ's finding that Saxton's treatment was conservative. Tr. 24 (ALJ noting that Saxton was not hospitalized and her treatment consisted of medication management visits). The ALJ's characterization of Saxton's treatment as conservative was accurate. *See, e.g., Burley v. Comm'r of Soc. Sec.*, No. 4:23-cv-218, 2023 WL 9604195, at *16 (N.D. Ohio Dec. 20, 2023) (the ALJ's characterization of the claimant's treatment as conservative was accurate since it "required no associated emergent, inpatient, or day program treatment

related to her mental health"), *report and recommendation adopted*, 2024 WL 1297554 (N.D. Ohio Mar. 27, 2024). And it was a proper basis for the ALJ to discount Saxton's reports of symptoms. *See id.*; *see* 20 C.F.R. § 404.1529(c)(3)(iv),(v) (ALJ considers treatment, including medication, that the claimant receives).

Saxton argues that the ALJ "does not discuss the objective findings in the treatment notes and only highlights the lack of certain findings." Doc. 10, at 18 (citing Tr. 24). She complains that the ALJ "essentially summarized a portion of treatment notes dated between September 2018 and February 2023 but generally did not discuss the positive findings within the treatment notes." *Id*. Saxton then spends the rest of this page in her brief string-citing over 150 pages in the record. *Id*. Saxton's complaint that the ALJ did not "discuss" five years worth of exam findings is odd since Saxton herself presents these findings as string-cites without discussing them. *See* Doc. 10, at 4–5, 18.

There are other problems with Saxton's argument. She string-cites 24 pages of exam findings showing that she had an overweight or obese build, Doc. 10, at 18, without explaining how this fact bears on her challenge to the ALJ's assessed mental limitations. The ALJ acknowledged that Saxton was diagnosed with binge eating disorder, Tr. 20; was obese, Tr. 20–21; and that her obesity did not result in functional limitations, Tr. 21; *see also* Tr. 40 (Saxton stating at the hearing that she had no complications related to her weight). The ALJ also found that Saxton's binge eating disorder was

"intertwined with her anxiety," Tr. 24, a statement that Saxton does not challenge. And while Saxton separately string-cites to 31 pages of the record (62 total pages) showing that she had fair insight and fair judgment, Doc. 10, at 18, the ALJ acknowledged that Saxton showed "fair insight and judgment."[11] Tr. 24. Indeed, the ALJ's finding that Saxton maintained "linear and logical thought content, no delusions, clear speech, grossly intact attention span and

concentration, and fair insight and judgment," Tr. 24, is supported by the record, *see supra*, pp. 4–14.

In any event, the ALJ is not required to discuss every piece of evidence in the record. *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004) ("An ALJ need not discuss every piece of evidence in the record for [her] decision to stand."); *Byler v. Kijakazi*, No. 5:20-cv-1822, 2022 WL 980099, at *9 (N.D. Ohio Jan. 21, 2022) ("Although Plaintiff understandably disagrees with the ALJ's decision, the law does not require the ALJ to discuss every piece of evidence that is supportive or inconsistent with the RFC. And … the ALJ cannot be expected to discuss every piece of evidence that Plaintiff believes is inconsistent with the RFC"), *report and recommendation adopted*, 2022 WL 971384 (N.D. Ohio Mar. 31, 2022). The ALJ did not err when she did

---

[11]     Also, Saxton's citations to the record are without context. For example, Saxton cites one treatment note showing that she was tearful. Doc. 10, at 19 (citing Tr. 367). At this visit, Saxton had "tearful but well modulated" speech "with pauses" as she processed her grief over the fact that her mother had entered hospice care and had "days to live." Tr. 367.

not discuss all of the treatment notes in the record.

Saxton points out that Social Security Ruling 16-3p provides that the ALJ must "consider all of the evidence." Doc. 10, at 19; Doc. 14, at 2. But a duty to "consider" the evidence is different than a duty to "discuss" the evidence. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (quoting *Loral Defense Systems–Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)). Saxton has not shown that the ALJ failed to *consider* all of the evidence. The ALJ stated that she considered the entire record. Tr. 20, 22. Absent evidence to the contrary, the Court will presume that this statement is true. *See NLRB v. Newark Elec. Corp.*, 14 F.4th 152, 163 (2d Cir. 2021); *see also United States v. Chemical Found., Inc.*, 272 U.S. 1, 14–15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."); *cf. Higgs v. Bowen*, 880 F.2d 860, 864 (6th Cir. 1988) (noting that the Appeals Council "state[d] that it 'considered the entire record which was before the administrative law judge, including the testimony at the hearing' "). And Saxton's recitation of "medical evidence does not show that the ALJ's decision is not supported by substantial evidence." *See Garcia v. Comm'r of Soc. Sec.*, No. 1:22-cv-1044, 2023 WL 2333520, at *7 (N.D. Ohio Jan. 27, 2023), *report and recommendation adopted*, 2023 WL 2330893 (N.D. Ohio Mar. 2, 2023); *see*

*also Jones*, 336 F.3d at 475 ("we must defer to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

Saxton complains that "the ALJ failed to acknowledge that virtually all of the treatment notes were obtained virtually, and the other content in the treatment notes was more significant in comparison to the mental status examination findings, such as the medication changes and symptomology," citing in support *Deanna S. v. Comm'r of Soc. Sec.*, No. 1:22-cv-602, 2023 WL 6295807, at *5 (S.D. Ohio Sept. 27, 2023). Doc. 10, at 19. In *Deanna S.*, the court found in relevant part that the ALJ's citation to objective exam findings in the record was faulty because the records didn't show what the ALJ said they showed—the visits were telephonic, precluding the provider from assessing "eye contact, appearance, and hygiene." 2023 WL 6295807, at *5. Here, Saxton does not allege that her virtual visits were held via telephone, Doc. 10, at 19, and she did not respond to the Commissioner's assertion that the record shows that the virtual visits were held using "facial recognition," Doc. 12, at 11 (citing, e.g. Tr. 325). Saxton fails to identify any problems with the provider assessing her objective exam findings virtually. She also fails to explain why the ALJ should have prioritized "medication changes and symptomology notes" over objective exam findings, and she doesn't cite any legal authority indicating that an ALJ must do so.

Saxton contends that the ALJ's statement that Saxton showed improvement in 2022 was "contradict[ed]" by treatment notes in the record. Doc. 10, at 19–22. The ALJ wrote:

> Notes after the date last insured showed improvement in 2022 as well; and therefore, there is no worsening condition that relates back.

Tr. 24. Saxton, at the July 2023 hearing, testified that her depression at that time had worsened since September 2021, Tr. 49, as the ALJ noted, Tr. 23. Meanwhile, earlier in the decision, the ALJ explained:

> May 2022 records from Hope 419 note a good mood, full affect, no irritability, and an ability to work through things. She had no suicidal/homicidal ideation, and her thought process was linear and goal directed, with grossly intact attention span and concentration. (Ex. 3F).

Tr. 23. Saxton does not challenge the ALJ's characterization of the May 2022 treatment note. *See also* Tr. 404–05 (May 2022 records). And while Saxton recites evidence from 2022 that she believes supports a different conclusion than the ALJ's, Doc. 10, at 21–22, she has not shown evidence to "contradict" the ALJ's conclusion that Saxton's condition did not worsen after September 2021, her date last insured, *id*. at 19, Tr. 24 (explaining that Saxton maintained certain baseline objective exam findings after her date last insured).

Finally, Saxton takes issue with the ALJ's conclusion that Saxton's daily activities were inconsistent with Saxton's allegations. Doc. 10, at 25 (citing Tr.

24). She argues that the ALJ didn't identify any inconsistencies. *Id*. But earlier in her decision, the ALJ explained that Saxton testified at the hearing that she had problems attending to her personal care, but wrote in her function report that she had no problems doing so. Tr. 21. This is an inconsistency. Regardless, the ALJ provided four other reasons why she discounted Saxton's allegations regarding her symptoms, Tr. 24, and these four reasons are sufficient.

All told, the ALJ cited numerous reasons for discounting Saxton's allegations about of the severity of her symptoms, and Saxton has not shown that the ALJ's reasons are improper or unsupported by substantial evidence.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 15, 2025

                */s/ James E. Grimes Jr.*
                James E. Grimes Jr.
                U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).